

ORIGINAL

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO
CIVIL DIVISION

KIMBERLY AND BLAKE SCHMIDT :
406 Princeton Drive
Trenton, OH 45067 :     A 1 3 0 7 2 3 9

:

    Case No.

:

    Judge

:

**Plaintiffs,**     :     **COMPLAINT &**
    :     **JURY DEMAND**

:

**v.**     :

:

**ABUBAKAR ATIQ DURRANI, M.D.**     :
6905 BURLINGTON PIKE
FLORENCE, KY 41042     *REGULAR MAIL WAIVER*
(Serve via Certified Mail) :

And     :

:

**CENTER FOR ADVANCED SPINE**     :
**TECHNOLOGIES, INC.**     :
6905 BURLINGTON PIKE
FLORENCE, KY 41042 :

Serve: CT Corporation System     :
1300 East 9th St. Ste 1010
Cleveland, OH 44114     *REGULAR MAIL WAIVER*
(Serve via Certified mail) :

**Defendants.**     :

D104094699 INI

FILED 2013 OCT 29 P 1: 18
TRACY WINKLER CLERK OF COURTS HAMILTON COUNTY, OH

---

Come now Plaintiffs, Kimberly and Blake Schmidt, and file this Complaint and

jury demand, and states as follows:

### FACTUAL ALLEGATIONS OF PLAINTIFFS

1.     At all times relevant, Plaintiffs, Kimberly and Blake Schmidt (hereinafter

1

"Plaintiff, Plaintiffs or Mrs. and Mr. Schmidt"), were residents of and domiciled in the State of Ohio.

2.      At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3.      At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4.      The amount in controversy exceeds the jurisdictional threshold of this Court.

5.      The subject matter of the Complaint arises out of medical treatment by the Defendants in Hamilton County, Ohio. This Court is thus the proper venue to grant the Plaintiffs the relief they seek.

6.      In 2007, Mrs. Schmidt was experiencing chronic pain and fatigue.

7.      In 2007 or 2008, Dr. Bard Tinkle diagnosed Mrs. Schmidt with EDS.

8.      In 2008 she was referred to Dr. Durrani while he was working at Children's Hospital.

9.      Dr. Durrani referred Mrs. Schmidt to Dr. Akbik at the time for pain management.

10.     In February 2012, Mrs. Schmidt completed x-rays at Mercy Hospital Fairfield.

11.     These x-rays revealed a normal lumbar and cervical spine.

12.     In March 2012, Mrs. Schmidt consulted with Dr. Durrani complaining of neck pain, migraines, extremity weakness and memory difficulties.

13.     Dr. Durrani ordered an MRI and CT scan of her cervical spine as well as an MRI of her thoracic and lumbar spine.

2

14.     The results showed L5-S1 disc protrusion and the cervical spine showed no issues
        including "no pannus formation."

15.     On March 15, 2012, Mrs. Schmidt followed up with Dr. Durrani he informed her
        that she had a huge pannus behind C2 and that she was a candidate for a C1-C2
        fusion.

16.     Dr. Durrani informed her that a simple car wreck could cause life threatening
        injuries to her neck.

17.     Dr. Durrani asked Mrs. Schmidt to schedule a surgery soon and Mrs. Schmidt
        declined to do so at the time.

18.     From April 2012 through November 2012, Mrs. Schmidt attended her friend,
        Staci Smith's appointments with Dr. Durrani.

19.     Dr. Durrani also informed Staci Smith that she had C1-C2 instability, a large
        pannus at C2 and that she would need a C1-C2 fusion surgery as well.  This occurred
        in November 2012.

20.     Following these coincidental diagnoses, Mrs. Schmidt and Staci Smith sought
        second opinions on the surgery.

21.     Both were told that there was no indication from the MRIs and CT scans ordered
        by Dr. Durrani for a C1-C2 fusion for either of them.

22.     Both were informed the symptoms they were experiencing had nothing to do with
        alleged C1-C2 instability.

23.     Dr. Durrani negligently diagnosed and recommended a medically unnecessary
        C1-C2 fusion surgery for Mrs. Schmidt.

24.     As a direct result of this recommendation, Mrs. Schmidt experienced severe

emotional distress and incurred extraordinary medical expenses she would not have otherwise incurred, including the bills sent to her from Dr. Durrani and CAST.

25.     The attached Affidavit of Merit supports these claims and is hereby incorporated by reference.

## **GENERAL ALLEGATIONS PERTINENT TO DR. DURRANI**

26.     Under CR8, this Complaint contains many "short and plain" statements supporting Plaintiff's relief. Each averment is simple, concise and direct. Under CR8(E)(1), there are "no technical forms of pleading."

27.     In this pleading, Dr. Mohammad Abubakar Atiq Durrani is referred as Dr. Durrani. The Center of Advanced Spine Technologies is referenced as CAST. West Chester Hospital, LLC and West Chester Medical Center are at times referenced as West Chester. UC Health is referenced as UC Health and collectively with West Chester Hospital, LLC at times as West Chester/UC Health. Children's Hospital of Cincinnati, Inc. is referenced as Children's Hospital and Children's.

28.     Furthermore, under CR8(F), "all pleadings shall be so construed as to do substantial justice."

29.     Under CR9(B), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."

30.     Plaintiffs' not only state fraud with particularity in this pleading, Plaintiffs can prove malice, intent and knowledge despite only being required to aver generally.

31.     Pursuant to CR10, the paragraphs of this Complaint each are limited to a statement of a single set of circumstances.

32. Under CR10(C), "statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion."

33. Plaintiffs' Complaint detail their individual specific factual allegations pertaining to their treatment and procedures by Dr. Durrani and the employees and agents of the relevant Defendant hospital pertaining to each Plaintiff.

34. What is pled in this Complaint is just not being alleged, it can and will be proven. It is based in part on limited discovery to date and witnesses who have come forward with relevant information.

35. Under CR9(B), Plaintiffs in their Complaint in this pleading will:

    A. Specify the statements attributed to Defendants claimed to be false.

    B. State the circumstances surrounding the making of the allegedly false statements, including time and place.

    C. Identify the persons claimed to have made the statement.

    D. Set forth the specific damages suffered as a result of the fraud.

36. The Defendants have in their possession their bills pertaining to each Plaintiff. Defendants prepared them. They sent them to Plaintiffs. These bills have the dates of claimed services and describe the alleged services.

37. Plaintiffs follow their lead. Defendants can't claim lack of notice and knowledge of their own bills.

38. The dates of the informed consents are contained in the medical records of Defendants and are in their possession.

39.     Defendants in Motions reminded everyone that Ohio has notice pleading and they needed to be properly put on notice of what the allegations and claims are so they can properly respond.

40.     The Complaint provides plenty of notice.

41.     The Plaintiffs did not learn of Dr. Durrani's fraud upon them until their post-Durrani care spine surgeons informed them of the unnecessary spine surgery based upon their post-Durrani care spine surgeons review of the Durrani pre-op radiology. The strength of Plaintiffs' cases are that they are based upon the objective proof of radiology.

42.     The Plaintiffs had limited knowledge of the hospital culpability until recent months when witnesses came forward with relevant information.

43.     Further discovery, including depositions and Defendants answering the outstanding written discovery due on other cases will provide more specifics.

44.     The Defendants have already been formerly identified in the Complaints.

45.     Corporations act through people. People have responsibility to fulfill their duties. When they fail in their duties, in circumstances where great harm occurs, they must be held accountable as individuals.

46.     Not for melodrama, but for purpose, context and relevancy to the institutional negligence and the total disregard of the health and well being of a human life, Plaintiffs plead the duty of the Hippocratic Oath taken by Dr. Durrani and all doctors and nurses involved in the tragedy that will always be known as the Dr. Durrani Case:
"At the time of being admitted as a member of the medical profession:

- I solemnly pledge to consecrate my life to the service of humanity;

- I will give to my teachers the response and gratitude that is their due;

6

- I will practice my profession with conscience and dignity;

- The health of my patient will be first consideration;

- I will respect the secrets that are confided in me, even after the patient has died;

- I will maintain by all the means in my power, the honor and the noble traditions of the medical profession;

- My colleagues will be my sisters and brothers;

- I will not permit considerations of age, disease or disability, creed, ethnic origin, gender, nationality, political affiliation, race, sexual orientation, social standing or any other factor to intervene between my duty and my patient;

- I will maintain my utmost respect for human life;

- I will not use my medical knowledge to violate human rights and civil liberties, even under threat;

- I make these promises solemnly, freely and upon my honor.

47.     The Plaintiff suffered the described harm at the hands of Dr. Durrani while Dr. Durrani operated under the auspices of his corporation he solely owned, CAST.

## ALLEGATIONS AGAINST DR. DURRANI AND HIS PRACTICE

### (These Facts Apply to All Defendants)

48.     Dr. Durrani is a citizen of the Republic of Pakistan and is a permanent resident of the United States of America.  He is not a citizen of the United States of America.

49.     From approximately 2005 to the present, Dr. Durrani has worked as a spine surgeon in Southwest Ohio, primarily in Cincinnati, Ohio in Hamilton and Butler County and in Northern Kentucky in Boone County.

50.     Beginning in 2008, Dr. Durrani opened a private practice called Center for Advanced Spine Technologies, Inc. ("CAST").

51.     Dr. Durrani is the sole owner of CAST.

52.     CAST currently has two offices, one in Evendale, Ohio at 10475 Reading Road, Suite 206, Cincinnati, Ohio, 45241, and one in Northern Kentucky at 6905B Burlington Pike, Florence, KY 41042.

53.     From at least 2009 through the present, Dr. Durrani performed numerous spine surgeries through his private practice, CAST, including all the ones of Plaintiffs relevant to their causes of action.

54.     The surgeries were often performed at different hospitals in the Cincinnati area or through an outpatient surgery facility called Journey Lite Surgery Center (Journey Lite). The Journey Lite facility is owned in part by Dr. Durrani and is also located at 10475 Reading Road, Cincinnati, Ohio 45241.

55.     Dr. Durrani previously had privileges to perform surgeries at Children's Hospital, Christ Hospital, Deaconess Hospital, Good Samaritan Hospital, and West Chester Hospital, but no longer has privileges at any of those hospitals based upon those hospitals no longer wanting to grant him privileges.

56.     From approximately 2011 through May 2013, Dr. Durrani primarily performed surgeries at Journey Lite and West Chester Medical Center.

57.     As of May 2013, Dr. Durrani no longer has privileges at West Chester Medical Center.

58.     Throughout his practice at CAST, Dr. Durrani, West Chester/UC Health, Journey Lite and Children's provided medical services to recipients of Medicare, Medicaid,

Anthem, Humana, United HealthCare, and other healthcare benefit programs as that term is defined in Section 24(b) of Title 18, United States Code.

59.     In July 2009, Dr. Durrani was charged with domestic violence in Warren County-537.14 M1. The relevancy to the claims is Dr. Durrani's views and prejudices towards women which are a part of this story.

60.     Multiple times a year for extended periods, Dr. Durrani travels to and from Pakistan, the place of his birth and childhood and his country.

61.     Dr. Durrani has told some Plaintiffs, patients and co-workers he's a Prince in Pakistan. A lie. In a deposition, Dr. Durrani mocked this allegation by stating Pakistan is not a monarchy so he could not be a Prince so he would never claim to be one. However, numerous Plaintiffs, patients and employees at Defendant hospitals maintain he represented he was a Prince. The relevancy to the claims is that Dr. Durrani's narcissism is a factor in the claims of Plaintiffs.

62.     Dr. Durrani maintains his family owns an international textile business, which makes him independently wealthy. A lie. In one deposition, he claimed he only had $2,000 when he came to America.

63.     Dr. Durrani claims ownership of a surgical tool business in Pakistan. This has not been verified or refuted.

64.     Several state and federal agencies have opened investigations into Dr. Durrani's surgical practices and his billing practices.

65.     Tri-state orthopedic and neurosurgeon doctors support Plaintiffs' medical malpractice, fraud and battery claims against Dr. Durrani. Anyone familiar with medical

malpractice claims recognizes the significance of a local physician testifying against another physician.

66.    Dr. Durrani's Application to the Kentucky Board of Medical Licensure includes many discrepancies including the following:

    a.  The date he attended and graduated from the Army Medical College, Rawalpindi, Pakistan.

    b.  Not reporting he had a South Carolina license

    c.  It's unclear if he's board certified.

    d.  Inconsistent dates of birth.

    e.  Did not timely complete the Kentucky HIV/AIDS education.

    f.  Inconsistent dates of residency and fellowship training.

    g.  A September 16, 2004, claims he has had no accreditations.

    h.  The credentials Analysis Report states the following omissions-

        i.  The Postgraduate Medical Education form completed by Children's Hospital Medical Center was not sealed or notarized.

        ii.  The Postgraduate medical Education form completed by Texas Scottish Rite Hospital for Children was not sealed or notarized.

        iii.  Score Transcripts for the NBME Parts I and II as reported by the applicant are not enclosed.

    i.  He did not complete his full fellowship from the University Of Florida College Of Medicine.

    j.  He barely passed the Nevada and Ohio Boards.

k. In 2008, he falsely claimed hospital staff privileges in Kentucky.

67. Dr. Durrani is a pathological liar.

68. Dr. Durrani admits in his deposition testimony he has numerous family members in the Pakistani government, but refused to name them.

69. According to Dr. Durrani himself, as published by him on August 5, 2013: "The University of Cincinnati Orthopedic Education and Research Fund has granted Atiq Durrani the funds to research local biochemical regulation of physical growth in a rat model." This is further proof of the UC Health connection to Dr. Durrani prior to his arrival at West Chester.

70. According to Dr. Durrani himself, as published by him on July 22, 2013: "In July of 1999, Atiq Durrani entered the Orthpedic Residency Training Program at the University of Cincinnati, Department of Orthopedic Surgery in Ohio." This is further proof of the UC Health connection prior to his arrival at West Chester.

71. In one of his Word Press ramblings, Dr. Durrani reports on grants he receives:

A. Synthes Spine- $70,000 a year

B. Medtronics- $59,170 a year

C. DePuy Spine- $74,790 a year

D. Wright Medical- 2008

E. Johnson & Johnson- $36,000

72. This contradicted his deposition testimony where he claims he's not paid money by companies. He claimed to be a "free" consultant. It also supports the new reality. Dr. Durrani is Exhibit A of pay me and I'll do and say what you want me to do

11

regardless of patient safety. This is a past, current and present danger in healthcare in America.

73. To this day, Dr. Durrani continues to misrepresent his status and his situation to the public.

74. Dr. Durrani self publishes self promotions obviously self written that border on the comical, but clearly narcissistic and delusional.

75. On MagCloud: Atiq Durrani added high honor to his sterling resume when he was awarded the Award of Honor in Orthopaedic Surgery by the National Institute of Medicine in 2013. The award is the latest in a long string of awards which renowned spinal surgeon Atiq Durrani has received in his career, including being named one of America's Top Orthopaedist in 2011. In addition Atiq Durrani was a Whitecloud Award Nominee for best Clinical Paper in 2010 and has been awarded several prestigious fellowships and trusteeships.

76. On Professional On The Web: Renowned spinal surgeon and founder of CAST (the Center for Advanced Spine Technologies), Atiq Durran has earned a reputation as a consummate professional and a man of unimpeachable moral fiber. Atiq Durrani has been the recipient of a slew of awards and accolades in his distinguished career, including being named on of America's Top Orthopedist in 2011 and being given the Award of Honor in Orthopedic Surgery by the National Institute of Medicine in 2013. Atiq Durrani's pioneering techniques have made many of his spinal surgeries into outpatient procedures.

77. From Word Press: Written by Dr. Durrani as declared on August 12, 2013: "As a leader in orthopedic medicine, Atiq Durrani as made monumental achievements in his

field of research and practice." "Atiq Durrani is revolutionizing the field of medicine in a way that has never been done before, making him a leader in his field." "Atiq Durrani has now established some of the most advanced orthopedic procedures in history and around the world. Atiq Durrani's work is being read, taught, and replicated all around the world."

78. Written by Dr. Durrani as declared on August 3, 2013: "The research of Atiq Durrani is the leading research in the field of orthopedics."

79. Written by Dr. Durrani as declared on July 29, 2013: "Atiq Durrani's achievements are known world-wide as the latest in orthopedic procedures and research." "Atiq Durrani has developed the most advanced spine program in the world, making his work the leading research in the field." "Atiq Durrani is revolutionizing the field of orthopedics and orthopedic surgery." "As he continues to excel in his area of specialty, Atiq Durrani gains more recognition around the world." "Atiq Durrani is at the forefront of his career, and is changing the way orthopedics is being performed by doctors from all over the world."

80. Written by Dr. Durrani as declared on July 27, 2013: "In 2005, Atiq Durrani was named a Trustee at the University of Orthopedic Research and Education Foundation."

81. "Atiq Durrani was also awarded the Award of Honor in Orthopedic Surgery by the National Institute of medicine in 2013."

82. So despite being under federal indictment, facing federal lawsuits and over 300 medical malpractice cases and certain license action, Dr. Durrani claims to be the #1 Orthopedic in the world.

## DR. DURRANI'S CRIMINAL CHARGES IN SUPPORT OF FRAUD AND BATTRY CLAIMS

### (These Facts Apply to All Defendants)

83. On July 25, 2013, Dr. Durrani was arrested and charged with Health Care Fraud and Making False Statements relating to Health Care by federal authorities.

84. A federal investigation remains ongoing into Dr. Durrani.

85. A state criminal and licensing investigation remains ongoing.

86. On August 8, 2013, a federal grand jury indicted Dr. Durrani for his conduct pertaining to surgeries he performed at West Chester/UC Health including performing unnecessary surgeries and billing private and public healthcare benefit programs for those fraudulent services.

87. The Indictment is filed in Case No. 1:13CR-084, USA v. Abubakar Atiq Durrani and is adopted and incorporated herein in its entirety and pursuant to CR10, it is attached as an Exhibit.

88. Several of the Plaintiffs cooperated with the United States Attorney's office in securing the indictment and are referenced in the indictment by a patient number. This is no secret to Defendants who by the descriptions know who they are, but the United States appropriately concealed their identity to the public.

89. Dr, Durrani's bond conditions prohibit him from traveling outside the Southern District of Ohio and the Eastern District of Kentucky. It requires his passport to be surrendered, but it does not prohibit him from practicing medicine. It requires him to notify his patients of the pending charges.

90. According to a public filing in the federal criminal case, USA v Durrani, 1:13-08 CR-00084, Government's Response to Defendant's Second Motion to Modify Conditions of Release, the United States believes Dr. Durrani is a flight risk. This should also concern this Court.

91. Although charged with ten counts of healthcare fraud and false statements, the United States stated in their Response: "the scheme and evidence involves a much larger number of patients." The Plaintiffs are part of that larger number.

92. The Response continues: "unlike a case involving simple billing fraud, this case alleges that the Defendant performed harmful and unnecessary procedures on patients. As a result, the focus is not simply on an amount of money paid, but on the significant, physical damage the Defendant caused to individuals and their families." This would include Plaintiffs.

93. The Response states: "Additional charges are expected."

94. As it is rare for local physicians to support a local malpractice claim, it is further a rare circumstance that the Defendant physician has federal criminal charges. It both reinforces the seriousness of the conduct and provides credibility to these claims. Dr. Durrani, their Defendants and their legal counsel claim are frivolous.

95. Dr, Durrani brazenly recently announced the formation of the Minimally Invasive Spine Institute which plans to open up offices in Dayton and Columbus.

96. Dr. Durrani also owns a company called Evolution Medical, LLC.

97. Medicaid recently has suspended Dr. Durrani as a provider for Medicaid beneficiaries.

98. Anthem has suspended Dr. Durrani as an authorized provider.

15

99.    The treaty between the United States and Pakistan limits the terms that qualify for extradition causing further flight risk concerns. Defendants legal counsel also claims to Plaintiffs counsel that Dr. Durrani fleeing could affect his liability coverage.

100.    When arrested, Dr. Durrani falsely told government investigators he was assisting the FBI in an investigation of Eric Deters for calling Dr. Durrani the Butcher of Pakistan.

101.    In a sick gesture, Dr. Durrani attempted to use his wife and children as a "trading card" in his bond request, when he has lived separately from them for years. In exchange for allowing Dr. Durrani to travel to Pakistan, he offered up his wife's and children's passports.

102.    Employees of Dr. Durrani have confirmed sexual and romantic relationships with Jamie Moor, a former Physician Assistant and Beth Garrett, a nursing school drop-out. This sordid information apologetically is relevant to Plaintiffs claims as detailed later because these relationships affected Dr. Durrani's patient care of Plaintiffs.

103.    Dr. Durrani was actually arrested by the federal government at the home of Beth Garrett.

104.    Dr. Durrani has opened The Spine Institute in Pakistan at Lahore and Multon, Pakistan.

105.    Dr. Durrani in a Motion to Modify Conditions of Release in his federal criminal trial wants to eliminate the patient notification of his criminal charges, not just for repeat patients, but any new patients within the tri-state area.

106.    The fact Dr. Durrani makes this request proves he wants to continue his continued deception, fraud and criminal acts on unsuspecting victims.

107. This bond change would allow Dr. Durrani at CAST, Journey Lite and his planned Dayton and Columbus locations to perpetuate his schemes on unsuspecting victims. The relevancy again is to Dr. Durrani's wholesale lack of integrity and public danger.

108. In addition, the US Attorney filed a pleading in the criminal case indicating Dr. Durrani failed to provide the required letter to a new unsuspecting victim.

109. Dr. Durrani has asked the Court in his criminal case to allow him to travel to Pakistan.

110. Even upon and after being arrested, Dr. Durrani announced a new Spine Institute by press release.

111. Dr. Durrani's criminal indictment is attached as an exhibit to this complaint and incorporated into this Complaint by reference pursuant to Ohio Rule 10(C).

112. The above paragraphs demonstrate the mind set and modus operandi of a diabolical, delusional, narcissistic and sadistic spine surgeon. Only a surgeon with these qualities could perform unnecessary spine surgeries on unsuspecting, vulnerable patients.

113. Dr. Durrani has nearly150 filed medical malpractice cases against him in Boone, Butler and Hamilton Counties.

114. Counsel for Plaintiffs has nearly 300 signed clients including those who are filed.

115. Dr. Durrani, CAST, West Chester/UC Health, and JourneyLite of Cincinnati LLC are Defendants and/or by their conduct tied to the following other litigation:

a.  Federal Civil Rico- 1:13 CV 202

b.  Federal Class Action- 1:13 CV 00301-TSB

c.  Hamilton County Class Action PureGen- A1305826

d.    Hamilton County Class Action Against Children's- A1305864

**ALLEGATIONS PERTAINING TO**

**DR. DURRANI, CHILDREN'S, UC HEALTH, WEST CHESTER HOSPITAL**

116.    Children's and UC Health share common financial funding, interests, goals, information, credentialing, staff, physicians, offices, resources, business interests, research, grants, and other common financial and structural components.  This is relevant as to the notice West Chester/UC Health had of Dr. Durrani's patient safety risk prior to granting him privileges.

117.    Children's Hospital had a spine fellowship with UC Health and an academic affiliation with UC Health.

118.    Dr. Durrani was the Director for a time of this spine fellowship.  While at Children's, Dr. Durrani did Spine Call at UC Health.

119.    When a new attending physician became privileged through Children's, Children's would automatically go through the process to get them accredited and credentialed at UC Health according to Dr. Durrani's own personal assistant for three years he worked at Children's.

120.    UC Health had and has a resident program at Children's.

121.    UC Health Orthopedic residents did and do a six month rotation at Children's.

122.    Scott Hamlin was CFO at Children's from 1997 to 2012.

123.    James Anderson was CEO of Children's from 1996 to 2009.

124.    On the West Chester Application for privileges for 2008, the time Dr. Durrani would have applied, there is what is called the Alliance Partners Central Verification

Office (CVO) "who provides centralized credentialing services for Health Alliance Hospitals."

125.    The Health Alliance of Greater Cincinnati, Inc. is now known as UC Health, and is therefore a necessary and proper party to this litigation. They were involved in the credentialing and granting privileges to Dr. Durrani at West Chester.

126.    The Health Alliance (UC Health) was a working partnership of independently owned hospitals.

127.    Founded in 1994, The Health Alliance originally included Christ Hospital, St. Luke Hospital, Jewish Hospital, Fort Hamilton Hospital and University Hospital. Christ Hospital left the Health Alliance in 2007 and is now an independent entity. The St. Luke Hospitals left in 2008 to become part of St. Elizabeth Healthcare in Northern Kentucky.

128.    Fort Hamilton Hospital left the Health Alliance to pursue negotiations to join Kettering Health Network. The Jewish Foundation completed the sale of Jewish Hospital in Kenwood to Mercy Health Partners. UC Health is now the sole member of the Alliance. UC Health now operates University Hospital, the region's only academic medical center, as well as West Chester Medical Center and the physician groups UC Physicians and Alliance Primary Care.

129.    The Health Alliance, n/k/a UC Health continues be a joint venture partner in other entities, including the Lindner Center of Hope psychiatric facility and University Pointe Surgical Hospital. It provides services to University Hospital, West Chester Medical Center and Alliance Primary Care.

130.    Under no set of circumstances with the relationships the Health Alliance partners, UC Health, Children's, Christ had with Dr. Durrani going back years before Dr. Durrani's arrival at West Chester, owned and operated by UC Health, did West Chester/UC Health not have full knowledge of the patient safety risks Dr. Durrani brought with him.

131.    The Health Alliance n/k/a UC Health has a history of issues with Durrani like problems.

132.    On May 21, 2010, the Health Alliance of Greater Cincinnati n/k/a UC Health and the Christ Hospital agreed to pay $108 million for violating anti-kickback statute and defrauding Medicare and Medicaid.

133.    On November 24, 2008 Dr. Durrani authored a letter to his patients when he left Children's. This letter sets forth the members of the Orthopedic Group at Children's. These orthopedics have and had privileges at UC Health, as well as, Children's. This letter contains the University of Cincinnati logo at the top corner, evidence of a relationship between UC Health and Children's. This letter is also evidence that Children's knew Dr. Durrani was going to treat Children's patients who left to treat with Dr. Durrani.

134.    Brenda Farris was employed and trained by Cincinnati Children's Hospital during the same time Dr. Durrani was an employee of Children's.

135.    Prior to 2009, Brenda Farris worked at Children's Hospital as an employee of Tri-Health as a physician's assistant.

136.    Brenda Farris is a licensed orthopedic nurse practitioner, and while performing

her duties in the Children's Orthopedic Clinic with Dr. Durrani, Nurse Farris

witnessed Dr. Durrani alter medical records.

137.    Brenda Farris would review x-rays, examine the child, measure the scoliosis, and

present the case to Dr. Durrani.

138.    In one case, Dr. Durrani changed her measurement of 28 degrees to 45 degrees so

that a surgery would be required on a twelve year old child.

139.    Krissy Probst was Dr. Durrani's professional and personal assistant handling

professional, academic, travel, surgery scheduling, his journals, his Boards, his

credentialing, his personal affairs and his bills.

140.    Krissy Probst worked as Dr. Durrani's assistant for three years at Children's

Hospital from 2006, 2007, and 2008.

141.    Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at

Children's for his having an affair with Jamie Moor, his physician assistant.

142.    Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three

other surgeons in the Orthopedic Department.

143.    Krissy Probst worked in the Orthopedic Department for eleven years from 2002-

2013.  She retired in May, 2013.

144.    Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

145.    According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated

Dr. Durrani "like a son."

146.    According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

147.    Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

148.    Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

149.    At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

150.    Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries. They did nothing.

151.    Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

152.    Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

153.    Dr Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

154.    Dr. Durrani would schedule two to three spine surgeries a day at Children's.

155.    Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

156. Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

157. Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

158. There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

159. Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

160. Dr. Duranni is now dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

161. Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

162. Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

163. Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

164. Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

165.   While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

166.   Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

167.   Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

168.   Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

169.   On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

170.   Defendants committed fraud by misrepresenting Dr. Durrani's reputation. Defendant knew he was doing unnecessary spine surgeries and concealing them from Plaintiffs. With the intent to mislead Plaintiffs, and knowing Plaintiffs would rely upon the misrepresentations and concealment, Defendant caused harm to Plaintiffs. Defendant knew their false information regarding Dr. Durrani was material to Plaintiffs decision making in choosing Dr. Durrani as a surgeon, allowing him to perform surgery, following his recommendation and being trusting to have their procedures at Defendant hospitals.

171.   Dr. Durrani's CAST website states in part: "The entire focus at CAST is on the patient. From the ease in getting in to see a physician…to wellness, therapy and treatment programs that can help patients avoid surgery…to minimally invasive

techniques if surgery is necessary…to our remarkable facility and one-site convenience. It's time patients have the level of preventive care and advanced treatment we offer. Atiq Durrani, MD- Founder of CAST." As shown and will be shown, this is a material misrepresentation which is false relied upon by Dr. Durrani's patients including Plaintiffs to allow Dr. Durrani to perform unnecessary surgeries on Plaintiffs.

172. Gerry Goodman worked under a Corporate Integrity Agreement in 2010 at West Chester/UC Health.

173. Gerry Goodman, from August to November 2010, while serving as the interim director of OR nursing at West Chester Medical Center, complained to administration including Mitch McCrate about Dr. Durrani's deviations and violations of law, policies, bylaws, rules and regulations which were effecting patient care, including Plaintiffs.

174. Mitch McCrate told Gerry Goodman West Chester/UC Health wasn't concerned because "the hospital had state funding and therefore was not held to qui tam rules."

175. Gerry Goodman told Mitch McCrate, General Counsel; Jack Talbot, HR; George Caralis, COO and Kevin Joseph, MD, President; that Dr. Durrani had a "partner" who had not received provider status and Dr. Durrani was billing his "partner" under Dr. Durrani's provider number, something which was illegal.

176. The "partner" was Dr. Shanti.

177. Dr. Durrani and Dr. Shanti would do three or four cases simultaneously and bill them simultaneously.

178. Gerry Goodman told McCrate, Talbot, Caralis and Joseph she could not work in a place which condones illegal practices. They asked her to ignore them. She refused.

179.    Dr. Durrani, according to Gerry Goodman, did whatever he wanted in the OR and knew he could get away with it including being treated like a king by the vendors.

180.    Vendors such as Medtronic representatives were allowed in the OR after going through the preapproved process they must go through. David Rattigan, Dr. Durrani's primary vendor, worked at Bahler peddling Medtronic products.

181.    Dr. Durrani was abusive to his and West Chester/UC Health staff. This was tolerated by West Chester/UC Health and effected patient care including that of Plaintiffs.

182.    Dr. Durrani never cared about others schedules or the West Chester/UC Health OR schedule.

183.    Dr. Durrani declared every surgery an emergency to ignore schedules.

184.    Dr. Durrani received two full days and two half days of block time at West Chester/UC Health. It was never enough time for his over utilization.

185.    When Gerry Goodman would say no to a Dr. Durrani scheduling request, Dr. Durrani would contact West Chester/UC Health administration and she would be overridden.

186.    Gerry Goodman had skill, knowledge and experience to recognize a "Dr. Durrani" because she had been involved in the outing of another over-utilizer and unnecessary procedure surgeon performing cardiac catherizations.

187.    Spine surgeons usually do one or two a day, possibly three surgeries a day if an emergency.

188.    Dr. Durrani would often do four, five and even six surgeries.

189.    Dr. Durrani and Dr. Shanti would walk from surgical room to surgical room with all the spine patients "open" for an extended time past the standards of care.

190.    On at least two occasions, Dr. Durrani patients were open for in excess of a hour waiting for him to come into the case.

191.    When Gerry Goodman would complain to Dr. Durrani about patients being anesthezed and the operative site open for long periods of time, Dr. Durrani would claim "we are covering anesthesia with antibiotics."

192.    When Dr. Durrani performed with Dr. Shanti these multiple simultaneous procedures, they were billed as if he was the attending surgeon in all three surgeries.

193.    The Dr. Shanti and Dr. Durrani "open and switch" to do the surgery, we have labeled the "Shanti Shuffle."

194.    The Shanti Shuffle is not the normal. Shanti did not assist, he replaced.

195.    Gerry Goodman complained to risk management repeatedly to no avail of the Shanti Shuffle.

196.    When Gerry Goodman pointed out to risk management, Jill Stegman and David Schwallie that Dr. Durrani had all the "red flags" from over utilization and being bounced out of other area hospitals, they responded "how did you know." Gerry Goodman knew because anyone in hospital administration and management in the tri-state in 2008 to 2013 knew. Dr. Durrani was no secret.

197.    Jill Stegman and David Schwallie admitted to Gerry Goodman they knew about Dr, Durrani's over utilization, being "bounced out" of other hospitals and all the issues going on with him with the OR, but West Chester needed Dr. Durrani's numbers.

198. When Gerry Goodman complained to George Caralis about Dr. Durrani, he told Gerry Goodman to "keep your mouth shut and go back to work because you are just an interim."

199. George Caralis told Gerry Goodman that West Chester/UC Health needed Dr. Durrani surgeries and admissions and therefore they were not going to stop him.

200. Jill Stegman and David Schwallie informed Gerry Goodman they would get back with her about Dr. Durrani in a few days. They never did.

201. After Gerry Goodman was blown off by David Schwallie and Jill Stegman, she decided to leave her work assignment at West Chester/UC Health.

202. Gerry Goodman checked the written consents of BMP-2 patients including Plaintiffs which Dr. Durrani, CAST and West Chester/UC Health had them sign and confirmed they did not provide consent to BMP-2.

203. Gerry Goodman reported on the lack of consent for BMP-2 also to Scwallie, Stegman, Joseph, Caralis, Talbot and McCrate and they ignored her.

204. Gerry Goodman verified there was nothing in the patients' charts, including Plaintiffs' charts, reflecting they were informed of the risks of off label use of BMP-2.

205. Upon hearing her repeated complaints about Dr. Durrani, George Caralis told Gerry Goodman she was just an "emotional female."

206. Gerry Goodman reported to no avail patient safety issues caused by the OR staff working from 7 AM to midnight on Dr. Durrani patients. Fatigue caused deviations in standard of care by West Chester/UC Health staff's including in Plaintiffs.

207. No action was taken by West Chester/UC Health's board or management to correct the informed consent issue on BMP-2. The time period of Gerry Goodman's

warning and complaints were fall 2010. Plaintiffs' claims arise from January 1, 2009 through May 2013. At least, according to Gerry Goodman's interim service, any Plaintiff having BMP-2 placed after the fall of 2010 at West Chester/UC Health is a further tragedy because the Board, administration and management can't obey notice and they allowed Dr. Durrani to continue placing BMP-2 at will. Why? Money. Despite having full knowledge of the issue, West Chester/UC Health's board and management allowed patients including Plaintiffs to have BMP-2 placed in them by Dr. Durrani at their facility without warning them, with full knowledge they were not warned.

208.    Gerry Goodman knew anesthesia charged per the minute or in fifteen minute increments and she considered it a fraud to bill for unnecessary anesthesia when patients were "open" longer than necessary.

209.    Dr. Durrani would contact Medtronics and other vendors directly, they would bring into the OR what Dr. Durrani requested and then invoice West Chester/UC Health.

210.    During surgeries, Medtronics and other vendors would want to up sell products.

211.    This process was distracting to the OR staff and affected patient care.

212.    Dr. Durrani told Gerry Goodman Dr. Shanti had privileges, but wasn't yet on all the insurance panels.

213.    Gerry Goodman asked Dr. Durrani: "Which panel so he's not doing those cases?"

214.    Dr. Durrani told Gerry Goodman in response: "We're doing these procedures together. They're billed under my name."

215.    Gerry Goodman witnessed one case where Dr. Durrani was never in the room at all, just Dr. Shanti. Yet, Dr. Durrani claimed the procedure.

216. Gerry Goodman confronted Dr. Shanti and he simply stated: "Dr. Durrani and I are co-surgeons."

217. Gerry Goodman verified Dr. Shanti was not on the written informed consents for these procedures.

218. Kevin Joseph, MD, and President of West Chester Medical Center, knew everything Gerry Goodman complained about because either she told him or George Caralis told him. Caralis told her he told him.

219. Dr. Durrani had no supervision at all at West Chester/UC Health.

220. When Gerry Goodman attempted to supervise him, the West Chester/UC Health management as described here rebuked her.

221. Gerry Goodman also informed Mitch McCrate, Jill Stegman, David Schwallie, George Caralis and Kevin Joseph, MD, that Dr. Durrani's high volume of fusions of the spine was not usual practice. They ignored these concerns.

222. West Chester/UC Health's board and management, did not provide proper supervision of Dr. Durrani as required through the surgery and orthopedic departments. (See Bylaws section to follow)

223. Gerry Goodman also spoke to the Chief of Surgery at West Chester Medical Center about Dr. Durrani to no avail.

224. The West Chester/UC Health manager who did analytics and kept records sent to Gerry Goodman at her request, months' worth of their BMP tracking. She kept it and still has it.

225.     West Chester/UC Health has previously denied tracking BMP-2. They lied. They tracked it to analyze the profit. They liked the profit. They encouraged Dr. Durrani to place all the BMP-2 he could.

226.     Based upon Gerry Goodman's documentation, Plaintiffs have requested and expect to receive all BMP-2 tracking as evidence of Plaintiffs BMP-2 claims.

227.     West Chester/UC Health's board and management, increased the cost of the surgeries of Plaintiffs and patients by using BMP-2 infuse.

228.     Dr. Durrani would also sign operative reports he never dictated with the full knowledge of West Chester/UC Health's board and management. This is yet another practice Gerry Goodman complained about.

229.     Dr. Shanti dictated operative reports he never signed with the full knowledge of West Chester/UC Health's board and management. They knew because Gerry Goodman complained.

230.     Orthopedics and spine surgeries are some of the highest sources of income for a hospital and were too for West Chester/UC Health.

231.     In the spring of 2013, Dr. Peter Stern told Dr. Angelo Collissimo, UC Orthopedic Surgeon, that West Chester/UC Health "knew all about Dr. Durrani's issues before he came to us and after he came to us, but we needed the money."

232.     The billings for Dr. Durrani surgeries were sent to Plaintiffs at their homes with requests for payment.

233.     Plaintiffs were required to make payments of uncovered medical bills to Dr. Durrani and CAST.

234.    Dr. Durrani produced, distributed and utilized a video of a lecture involving his
EDS patients to solicit more patients.

235.    Unbeknownst to his EDS patients, Dr. Durrani was doing experiments on these
EDS patients including many of the Plaintiffs without informing them they were part of
an experiment.  This too violated West Chester Medical Staff Bylaws as revealed in a
later section.

236.    Dr. Durrani claims in his EDS video a 95% success rate with the C1-C2
operations and only one of the twenty-five claimed they would not have the surgery
again.

237.    The undersigned counsel represents 20 of these 25 persons and not one would
have the surgery again.  They are Plaintiffs.

238.    Dr. Tayeb was an employee of Dr. Durrani from 2009 to 2013.  Counsel has
interviewed him extensively.

239.    Dr. Tayeb will testify that Dr. Durrani improperly selected patients for surgery,
and then recommended surgery, including patients with EDS that were not proper
candidates for surgery including many of the Plaintiffs.

240.    Dr. Tayeb will testify that improper business practices occurred at CAST,
including Dr. Durrani recommending surgeries that were medically unnecessary
including the Plaintiffs.

241.    Dr. Tayeb will testify that Dr. Durrani made decisions to place wealth and status
over the well-being of his patients including Plaintiffs.

242.    Dr. Tayeb, Dr. Durrani's pain management doctor for a time at CAST, reports
that Dr. Durrani's misuse of BMP-2 resulted in bony overgrowth, where "it's like a big

block of bone back there where you can't even stick a needle there anymore" and patients, including Plaintiffs would develop neuropathic pain.

243.    Dr. Tayeb could not reach the nerve in many of the BMP-2 patients to even treat with injections.

244.    Dr. Tayeb would engage Dr. Durrani in shouting matches at CAST over patient care that others witnessed.

245.    Elizabeth Dean was employed at West Chester Medical Center before they opened the doors for business.

246.    Elizabeth Dean was one of the original patient access representatives at West Chester Medical Center, which is now West Chester Hospital, beginning employment in February 2008 to July 2010.

247.    Elizabeth Dean had many responsibilities within the hospital including admitting Dr. Durrani patients and completing financial reports for the West Chester/UC Health CFO, Mike Jeffers.

248.    Elizabeth Dean was also included in most corporate meetings where discussions took place over the mass injections performed by Dr. Durrani in the testing area of the hospital and she also was the actual patient access representative who registered and spoke with all the Durrani patients.

249.    According to Elizabeth Dean, before Dr. Durrani began to practice at West Chester Hospital, every area of the hospital was a "ghost town."

250.    Despite being a new hospital, it was still not picking up revenue as it expected.

251.    Elizabeth Dean was required to ask for all copays when the patients arrived, just to "keep the numbers up" as much as possible.

252. Elizabeth worked for five years as a medical biller with University Internal Medicine Associates before coming to West Chester.

253. Elizabeth Dean knew West Chester/UC Health needed money based upon her position and work at West Chester.

254. Elizabeth Dean reviewed the final numbers from CFO Mike Jeffers each month and also logged all payments received on the surgery cases including Dr. Durrani's.

255. West Chester/UC Health's board and management gave staff raises based upon the hospitals financial woes.

256. West Chester/UC Health fired the original CEO and corporate employees once the hospital was bought by UC Health, and appointed an ER physician as the new CEO, Kevin Joseph, MD.

257. Elizabeth Dean will testify that West Chester/UC Health decided to have West Chester/UC Health ran by physicians.

258. Vickie Scott worked at West Chester in the operating room during the time Dr. Durrani also worked there.

259. OR Nurses, including Vickie Scott, went to the OR management, Elaine Sreinko and Denise Evans and to Risk Management, Jill Stegman, about Durrani's illegal activities, deviations in standard of care and violations of policies, bylaws, regulations and rules. No action was taken. They complained and reported the same issues Gerry Goodman reported as previously described.

260. Vickie Scott informed Elaine Sreinko, OR assistant manager, about Dr. Durrani making the records appear that Dr. Durrani was doing all the procedures when they knew it was Dr. Shanti. Sreinko did nothing to stop the Shanti Shuffle.

261.    Scott Rimer, circulating nurse at West Chester Medical Center, spoke up and complained about Dr. Durrani at an OR meeting with OR staff and hospital administration. Not only was Scott Rimer ignored, the next day he had his supervisor standing next to him watching his every move. He was fired soon after.

262.    In summary, Gerry Goodman, Vickie Scott, Scott Rimer and other OR staff members complaints to management included the number of Dr. Durrani surgeries he did a day and at a time; other surgeons performing surgeries for him without proper consent; Dr. Shanti not having proper qualifications and provider numbers; BMP-2 was tracked by the hospital despite their denials of doing so; Dr. Durrani was verbally abusive to everyone; anesthesiologists had to have patients "under" longer than they should have been; off label use of BMP-2 was not covered by informed consent; Medtronic reps would "up-sale" during surgeries; operative reports were not timely completed; Dr. Durrani had no supervision by the hospital; keeping OR staff past the time it was safe.

263.    Those Gerry Goodman, Vickie Scott, Scott Rimer and other OR staff members complained to included Mitch McCrate, Jack Talbot, George Caralis, Kevin Joseph, MD, Melissa Hemmer, Elaine Sreinko, Denise Evans, Jill Stegman, David Schwallie. All of these individuals are and/or were West Chester/UC Health management who communicated these complaints to the board. Many like Kevin Joseph, MD, President were on the board.

264.    West Chester/UC Health, its board and management, also knew of Dr. Durrani's sexual harassment of OR nurses and staff and ignored it.

265.    Melissa Dowler witnessed Dr. Durrani offer a nurse in the OR $10,000 for oral sex.

266.    Dr. Durrani had an affair with his staff member, Beth Garrett, who dropped out of nursing school, and like his relationship with a prior physician assistant at Children's Hospital, Jamie Moor it affected patient care.

267.    Dr. Durrani, by his deposition testimony, admits he relies upon his own reading of radiology. Of course, in this manner he would recommend a surgery the radiology did not support. The radiology department at West Chester, the director of radiology and all the radiologists privileged at West Chester from January 1, 2009 to June 1, 2013, knew Dr. Durrani was ignoring their radiology interpretations and did nothing to address the issue and/or were ignored when they tried to address the issue.

268.    Dr. Durrani, by his deposition testimony, admits he informs the pain doctor where to inject medicine. By doing so in the wrong place, he convinced many Plaintiffs to have repeat surgeries.

269.    Melissa Garrett is forty-one (41) years old, and is a pharmaceutical salesperson in Tampa, Florida. Melissa Garrett said her sister Elizabeth "Beth" Garrett who currently worked for Durrani/CAST.

270.    Melissa Garrett contacted counsel and stated that Beth Garrett was holding herself out as a nurse, although Beth Garrett had failed out of nursing school.

271.    Melissa Garrett stated that Beth Garrett had been present during surgeries by Dr. Durrani.

272.    She stated that Beth Garrett had improperly assisted in surgical procedures performed by Dr. Durrani without a nursing license.

273.    She stated that Beth Garrett had been improperly selling pharmaceutical products, without a license.

274. She stated that Beth Garrett was having an "affair" with Dr. Durrani, and that she was concerned after Beth Garrett brought Dr. Durrani to her son's elementary school function and that the family "freaked out" in response to Beth Garrett and Dr. Durrani's conduct during the school function.

275. Dr. Durrani prescribes a custom compound cream he sells to patients without informing them which he bills to their insurance and just sends to them.

276. On information and belief Dr. Durrani owns some interest in this compound cream in a physician owned distributorship (POD) arrangement.

277. Shauna O'Neal followed Gerry Goodman to West Chester as Director of Nursing.

278. Shauna O'Neal came from Compass Clinical Consulting group in Cincinnati.

279. Shauna O'Neal wrote a letter to Tom Daskalakis the COO of West Chester/UC Health, Kevin Joseph, MD, and the CNO in which in which she reiterated what Gerry Goodman reported regarding Dr. Durrani's OR bookings and Dr. Shanti's lack of credentials and/or privileges. She was ignored.

280. Thomas Kunkel, MD, anesthesiologist, complained to West Chester/UC Health's board and management about Dr. Durrani's high number of "add on" patients. He was ignored.

281. According to Gerry Goodman, Dr. Durrani did add on patients at the last minute and after regular business hours so there was no one to preauthorize patients or question Durrani in any way regarding the surgery.

282. Dr. Durrani always told Thomas Kunkel, MD the surgeries were emergencies.

283. At times anesthesiology demanded the Chief of Surgery to intercede to judge whether or not it was emergent.

284. Cindy Traficant was Periop Director before and after West Chester opened.

285. When UC Health took over, Julie Holt, the original CNO, quit.

286. Cindy Traficant became interim CNO.

287. Cindy Traficant had a reputation of tolerating "bad" physicians.

288. West Chester Surgery was nicknamed by staff at West Chester/UC Health the "island of misfit" doctors because they took in and tolerated any doctor no matter their ethics, including Dr. Durrani.

289. OR staff collectively reported Dr. Durrani issues to West Chester/UC Health board and management and their complaints were ignored.

290. Dr. Durrani would sometimes, because he was running behind, cancel part of a surgery or do only part of the surgery, thus requiring the patient to have another surgery, all without informing the patient the cancellation was because he was late.

291. Dr. Durrani performed 159 surgeries at West Chester Medical Center in 2009; 534 in 2010; 536 in 2011; 437 in 2012; and 157 in 2013 for a total of 1,823 surgeries.

292. West Chester/UC Health admitted in a discovery answer in the Shell case that for the investigation, background check and the information used to decide to grant Dr. Durrani privileges they relied upon in part:

      A. Dr. Durrani's education.

      B. Dr. Durrani's training and experience.

      C. Copies of his licenses and DEA numbers.

      D. Inquiry to the National Practitioners Data Bank.

      E. Evidence of required continued education.

293. West Chester/UC Health refuses to provide under a claim of privilege all persons they consulted prior to permitting Dr. Durrani privileges.

294. Dr. Durrani total **surgeries** performed as answered in a discovery in Shell at West Chester is as follows:

2009: 665

2010: 1908

2011: 1736

2012: 1102 (Through 9/30/12)

295. Dr. Durrani admitted as **inpatient** based as answered in a discovery answer in Shell at West Chester is as follows:

2009: 154

2010: 488

2011: 507

2012: 305 (Through 9/30/12)

296. Dr. Durrani admitted as outpatients based as answered in a discovery answer in Shell at West Chester is as follows:

2009: 13

2010: 41

2011: 45

2012: 35 (Through 9/30/12)

297. West Chester/UC Health refuses to provide under a claim of privilege their investigation to determine Dr. Durrani's fitness to practice medicine prior to permitting Dr. Durrani privileges.

298.    West Chester/UC Health refuses to provide under claim of privileges, the

instances where Dr. Durrani did not follow proper medical documentation protocol,

policies and/or procedures at West Chester/UC Health.

299.    West Chester/UC Health refuses to provide under claim of privileges, the

complaints made by employees, staff or patients related to Dr. Durrani.

### VIOLATIONS OF FEDERAL & STATE LAW

300.    The Defendants engaged in a common scheme involving civil conspiracy, fraud,

material misrepresentation, deceit, and extreme and outrageous conduct intentionally

directed at each of the patients. In furtherance of their scheme to defraud, the

Defendants have violated and/or caused others to violate several statutes, regulations,

and other state and Federal legal requirements including but not limited to:

e.      Ohio Product Liability Act, RC. 2307.71-2307.80;

f.      42 C.F.R. §482.13, codifying the Patient's Right to Informed Consent;

g.      42 C.F.R. §482.51, covering the informed consent of surgical patients;

h.      45 C.F.R. Part 46, et seq., specifically 45 C.F.R. §46.122, covering the conducting

of medical research on human subjects with the support of federal funds, known as the

"Common Rule";

i.      18 U.S.C. §1035, covering the criminal act of making "False Statements Relating

to Health Care Matters" involving any health care benefit program, public or private;

j.      18 U.S.C. §1347 of the Criminal Code covering "Health Care Fraud" involving

any health care benefit program, public or private;

k.      18 U.S.C. §§ 1341, 1343, 1956, 1957, and 2314 covering "Mail Fraud", "Wire

Fraud", "Money Laundering", "Use of Dirty Money", and "Travel to Effect the Scheme",

to effectuate the fraudulent scheme; and

l.      The violation of the warning letter from the FDA dated June 23, 2011 warning against promoting and marketing PureGen without FDA approval; and for violating the Food Drug and Cosmetic Act, 21 U.S.C. § 351, et seq., by marketing a device without premarket approval, 510k clearance, meeting the humanitarian device exception, exemption from the Act, or other qualification to market the device; for violating the Public Health Service Act 42 U.S.C. §201, et seq., specifically § 262(a) and (i), and related federal regulations, specifically 21 C.F.R. 1271.10(a)(4)(ii)(b); for violating the Food Drug and Cosmetic Act 21 U.S.C. §351, et seq., specifically § 355(a) and (i), and 21 C.F.R. 312; and the Public Health Service Act 42 U.S.C. 262, specifically § 262(a) and (i).

301.    Beginning in approximately 2005 and continuing through the present, Dr. Durrani derived significant profits by convincing patients, including Plaintiffs, to undergo medically unnecessary spinal surgeries and by billing private and public healthcare benefit programs for their fraudulent services.

302.    Dr. Durrani performed unnecessary spine surgeries on Plaintiffs and this proximately caused serious bodily injury and/or harm to Plaintiffs.

303.    Dr. Durrani, convinced Plaintiffs with false representations that surgery was their only option, when in fact the patient did not need surgery.

304.    Dr. Durrani convinced Plaintiffs with false representations that Plaintiffs' medical situations were urgent and required immediate surgery.

305.    Dr. Durrani convinced Plaintiffs with false representations that Plaintiffs were at risk of grave injuries without the surgery Dr. Durrani recommended.

306.    Dr. Durrani convinced Plaintiffs with false representations that Plaintiffs risked paralysis or their head would fall off if the Plaintiffs were in a car accident.

307.    Dr. Durrani did not read or ignored the radiology reports written by the radiologists for imaging studies that Dr. Durrani ordered on Plaintiffs including x-rays, CAT scans and MRIs and failed to disclose this to Plaintiffs.

308.    Dr. Durrani convinced Plaintiffs with false representations that Plaintiffs based upon Dr. Durrani's own exaggerated and dire reading of the patient's imaging that was either inconsistent with or plainly contradicted by the report written from the radiologist, that Plaintiffs needed surgery.

309.    Dr. Durrani provided a false reading to Plaintiffs of their pre-surgical imaging.

310.    Dr. Durrani dictated he had performed certain physical examinations and procedures on Plaintiffs that he did not actually perform.

311.    Dr. Durrani ordered a pain injection for a level of the Plaintiffs' spine that was inconsistent with the pain stated by the Plaintiffs or the imaging.

312.    Dr. Durrani scheduled Plaintiffs for surgeries without learning or waiting for the results of certain pain injections or related therapies on Plaintiffs.

313.    Dr. Durrani dictated Plaintiffs' operative reports or other Plaintiffs' records months after the actual treatment.

314.    Dr. Durrani placed in Plaintiffs' operative reports and treatment records false statements about the diagnosis for the Plaintiffs, the procedures performed, and the instrumentation used in the procedure.

315.    Dr. Durrani failed to inform the Plaintiffs of or misrepresented the nature of the complications they experienced as a result of the surgeries he performed on Plaintiffs.

316.    Dr. Durrani made false statements to colleagues about the success of Plaintiffs' surgeries.

317.    Dr. Durrani made false statements to Plaintiffs about why a surgery would not be performed at a certain hospital.

318.    Dr. Durrani made false statements to Plaintiffs regarding why he no longer practiced at certain hospitals.

319.    Plaintiffs were left in a worse financial and medical condition and position due the unnecessary surgeries Dr. Durrani performed.

320.    Dr. Durrani knowingly and willfully executed and attempted to execute their scheme and artifice to defraud, obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of health care benefit programs as defined in Title 18, United States Code, Section 24(b ), in connection with the delivery of, billing, and payment for health care benefits, items, and services including to Plaintiffs.

321.    Peter Stern, MD, President and/or Chief of Staff (at one time) of West Chester Medical Center (West Chester/UC Health) knew Dr. Durrani was a patient safety issue, but West Chester Medical Center was in such financial trouble West Chester/UC Health "looked the other way."

322.    On May 16, 2013, it was publicly announced in Cincinnati newspapers Jim Kingsbury was stepping down as CEO of UC Health.

323.    Jim Kingsbury in 2008 left the Health Alliance and UC Medical Center to help establish a hospital in Dubai which also involved Dr. Durrani.

324.    In 2010, Jim Kingsbury was rehired by UC Health (formerly known as the Health Alliance).

325.    Jim Kingsbury's favorable relationship with Dr. Durrani aided Dr. Durrani being allowed to maintain privileges at West Chester Medical Center despite Mr. Kingsbury's and West Chester/UC Health's, board and management knowledge of all which has been alleged in this Complaint.

326.    During the time Dr. Durrani was an employee at Children's, he had privileges at Christ Hospital and UC. UC Health knew about Dr. Durrani's issues all the way back in 2003 to 2008.

## COUNT I: NEGLIGENCE- DR. DURRANI & CAST

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

327.    Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

328.    Dr. Durrani, acting individually and through CAST, deviated from the standard of care for a spine surgeon by failing to exercise the skill, care and diligence of a spine surgeon under like or similar circumstances in his treatment of Plaintiffs and that deviation proximately caused harm to Plaintiffs as detailed in Plaintiffs Complaint.

329.    CAST's Board, their management, staff, employees, nurses, technicians and agents, all during the scope of their employment and/or agency owed Plaintiffs the duty to exercise the degree of skill, care, and diligence of an ordinary prudent health care provider and hospital would have exercised under like or similar circumstances as detailed in the Plaintiffs' Complaint and they breached their duty. The breach

proximately caused harm to Plaintiffs, as detailed in this pleading and is reaffirmed here.

330. CAST's management, staff, employees, nurses, technicians and agents, all during the scope of their employment and/or agency as identified in each of Plaintiffs medical records, and with the full blessing of CAST, knowingly and/or negligently, as reflected in each Plaintiff's records, participated and assisted Dr. Durrani in the negligent diagnosis and committed the following malpractice by breaching their duty as follows:

    A. Negligently screened Plaintiff for surgery.

    B. Negligently approved Plaintiff for the surgery.

    C. Negligently informed Plaintiff that they had a pannus in their cervical spine.

331. The basis for the allegation of A-C above is the management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of CAST's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of CAST as described in detail in this pleading.

332. CAST's management, staff, employees, nurses, technicians, agents and representatives should have refused to assist Dr. Durrani in these procedures; they should have stopped Dr. Durrani from doing these procedures; they should have gotten Dr. Durrani's dog the hell out of the surgical suite.

333. No one, including Defendants, can escape culpability and liability simply by remaining silent like sheep for shepherds who our fools.

334. As a direct and proximate result of these Defendants' acts and omissions by and through its agents and/or employees, Plaintiffs sustained prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT II: NEGLIGENT HIRING, RETENTION, CREDENTIALING, & SUPERVISION- CAST

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

335. Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

336. CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

337. CAST breached their duty to Plaintiffs, inter alia, by not controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at Defendant facilities.

338. As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by the residents, doctors, nurses, and those with privileges by Defendant facilities, Plaintiffs incurred prolonged pain and suffering, emotional distress, humiliation, discomfort,

loss of enjoyment of life, loss of the ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT III: FRAUD – ALL DEFENDANTS

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

339.    Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

340.    Defendants made material, false representations to Plaintiffs and their insurance company related to Plaintiffs' treatment including: stating the surgeries were necessary, that Dr. Durrani "could fix" Plaintiffs, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiffs would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, that "I will fix you", that Plaintiffs were medically stable and ready to be discharged.

341.    In addition, Dr. Durrani represented to the Plaintiff that they had a pannus in their cervical spine when there was in fact no such thing.

342.    Defendants knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

343.    Dr. Durrani manipulated his diagnosis and the medical tests to recommend surgery that he knew was not indicated.

344. Dr. Durrani was operating a scam in which he would receive referrals through the facility and the medical community, conduct experiments on behalf of Medtronic using their products, and perform those surgeries on whomever his patients were regardless of medical need all with the full knowledge of Defendants.

345. Defendants made the misrepresentations both before and after the surgeries with the intent of misleading the insurance company and the Plaintiffs into reliance upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgeries, and to induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

346. The Plaintiffs were justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust them.

347. There is no expectation that a doctor will have so compromised his/her medical judgment as to endanger their patients in experimental and unnecessary surgeries such that the patient should have a duty to engage in an in-depth investigation of the doctor to ensure their medical judgment is not so compromised.

348. The Plaintiffs relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at their health care facility as assurance the facility was overseeing Dr. Durrani and vouching for his surgical abilities.

349. The facility expected this reliance and requires patients to trust the facility to only allow surgeons who are competent and trustworthy to perform surgeries there.

350.    The insurance company of Plaintiffs justifiably relied on the misrepresentations in the billing documents they received because it would be so reckless for a facility to have no safeguards to protect its patients from such flagrant fraud and abuse from their doctors that it would be unreasonable for the insurance company to foresee the possibility.

351.    Dr. Durrani's scheme required the cooperation, either through complicity or through affirmative support, of the facilities including West Chester/UC Health at which he operated; they either had to turn a blind eye to what was happening or take steps to support it, and otherwise it would have been impossible for Dr. Durrani to do this.

352.    The billing sent by Defendants to Plaintiffs is false.

353.    All billing related to Dr. Durrani's unnecessary surgeries to Plaintiffs should never have been sent.

354.    As a direct and proximate result of the aforementioned fraud, Plaintiffs did undergo surgeries which were paid for in whole or in part by their insurance company, and suffered severe and grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT IV: INTENTIONAL INFLICATION OF EMOTIONAL DISTRESS- DR. DURRANI

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

355.    Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

356.    Dr. Durrani's conduct is so outrageous and it was the proximate and actual cause of the Plaintiffs' psychological injuries, emotional injuries, mental anguish, suffering, and distress.

357.    The Plaintiffs suffered distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## COUNT V: LOSS OF CONSORTIUM & MEDICAL EXPENSES- ALL DEFENDANTS

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

358.    Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

359.    At all times relevant, many of the Plaintiffs were married.

360.    As a result of the wrongful acts and omissions of the Defendants, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

361.    All the aforesaid injuries and damages were caused solely and proximately by the acts and omissions of the Defendants.

## COUNT VI- OHIO CONSUMER SALES PROTECTION ACT- CORPORATE DEFENDANTS

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

362.   Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

363.   The Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians.

364.   It should not exempt physicians, but it does.

365.   However, a transaction between a hospital and a patient/consumer is not clearly exempted.

366.   Defendant hospital services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

367.   Defendant hospitals omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

368.   Defendants' misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

369.   Defendants were fully aware of its actions.

370.   Defendants were fully aware that Plaintiffs were induced by and relied upon Defendants' representations at the time Defendants were engaged by Plaintiffs.

371.   Had Plaintiffs been aware that Defendants' representations as set forth above were untrue; Plaintiffs would not have used the services of Defendants.

372.   Defendants, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

376. Each of the Defendants altered documents, including medical records to further their schemes including the delay in the production of records to allow records to be "cleansed."

377. Patients, including Plaintiffs, have not been able to obtain their medical records from Dr. Durrani and CAST.

378. As outlined in this Complaint, there were countless falsification of records.

379. All Defendants failed to abide by and comply with Plaintiffs preservation of evidence and electronic email.

380. All Defendants destroyed and altered records.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request and seek justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1. Past medical bills;

2. Future medical bills;

3. Lost income and benefits;

4. Lost future income and benefits;

5. Loss of ability to earn income;

6. Past pain and suffering;

7. Future pain and suffering;

8. Plaintiffs seek a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9. All incidental costs and expenses incurred as a result of their injuries;

10. The damages to their credit as a result of their injuries;

53

11.     Loss of consortium;

12.     Punitive damages;

13.     Costs;

14.     Attorneys' fees;

15.     Interest;

16.     All property loss;

17.     All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-17 itemization of damages, the damages sought exceed the minimum

jurisdictional amount of this Court and Plaintiffs seek in excess of $25,000.

18.     Incarceration of Defendants;

19.     The License of Defendants;

20.     An apology;

<div style="margin-left: 50%;">

Respectfully Submitted,


 /s/ Eric C. Deters_____
Eric C. Deters (# 38050)
Attorney for Plaintiff
5247 Madison Pike
Independence, KY 41051
859-363-1900 Fax: 859-363-1444
eric@ericdeters.com
</div>

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

<div style="margin-left: 50%;">

 /s/ Eric C. Deters_____
Eric C. Deters
</div>

# COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

REQUEST AND INSTRUCTIONS FOR ORDINARY MAIL SERVICE

Kimberly and Blake Schmidt
_____
**Plaintiff**

-vs-

Abubakar Atiq Durrani, MD, et al.
_____
**Defendant**

**INSTRUCTIONS TO THE CLERK**

CASE NUMBER: A 1 3 0 7 2 3 9

**IF SERVICE OF PROCESS BY CERTIFIED MAIL IS RETURNED BY THE POSTAL AUTHORITIES WITH AN ENDORSEMENT OF "REFUSED" OR "UNCLAIMED" AND IF THE CERTIFICATE OF MAILING CAN BE DEEMED COMPLETE NOT LESS THAN FIVE (5) DAYS BEFORE ANY SCHEDULED HEARING, THE UNDERSIGNED WAIVES NOTICE OF THE FAILURE OF SERVICE BY THE CLERK AND REQUESTS ORDINARY MAIL SERVICE IN ACCORDANCE WITH CIVIL RULE 4.6 (C) OR (D) AND CIVIL RULE 4.6 (E).**

Eric C. Deters
_____
**ATTORNEY OF RECORD** (TYPE OR PRINT)

10/29/2013
_____
**DATE**

\s\Eric C. Deters
_____
**ATTORNEY'S SIGNATURE**

TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH

2013 OCT 29 P 1: 19

FILED



## COMMON PLEAS COURT
## HAMILTON COUNTY, OHIO

Kimberly and Blake Schmidt

A 1 3 0 7 2 3 9

CASE NO. _____

VS

WRITTEN REQUEST FOR SERVICE
TYPE OF PAPERS TO BE SERVED ARE

Abubakar Atiq Durrani, MD, et al.

Complaint and Written Discovery

( ʙ) PLEASE CHECK IF THIS IS A
DOMESTIC CASE

PLAINTIFF/DEFENDANT REQUESTS:         EXPRESS MAIL SERVICE _____

CERTIFIED MAIL SERVICE _X_____       REGULAR MAIL SERVICE _____

PERSONAL SERVICE _____         RESIDENCE SERVICE _____

PROCESS SERVICE _____          FOREIGN SHERIFF _____

ON Abubakar Atiq Durrani, MD 6905 Burlington Pike, Florence, KY 41042

Center For Advanced Spine Technologies, Inc., serve: CT Corporation System

1300 East 9th Street, Ste. 1010 Cleveland, Ohio 44114

TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH
2013 OCT 29 P 1: 9
FILED

# Eric C. Deters

**ATTORNEY**

5247 Madison Pike Independence, KY 41051

**ADDRESS**

## 859-363-1900

**PHONE NUMBER**

## 38050

**ATTORNEY NUMBER**